OPINION
Appellants, Marcia and Raymond Boylan, appeal an order of the Butler County Court of Common Pleas, Juvenile Division, placing their daughter, Amanda Boylan, in the permanent custody of the Butler County Children's Services Board ("BCCSB").
In April 1995, BCCSB filed a complaint in the Butler County Court of Common Pleas, Juvenile Division, alleging that Amanda, born February 16, 1992, was a neglected, abused, and dependent child. The complaint alleged that Raymond Boylan, Amanda's father, had sexually abused her. The complaint also contained allegations by Raymond's former wife, one of Raymond's children by his first marriage, and his former brother-in-law that they had been sexually or physically abused by Raymond. Following an emergency ex parte hearing, Amanda was placed in the temporary custody of the BCCSB. On April 27, 1995, a shelter care hearing was held at which the trial court terminated BCCSB's custody of Amanda. The girl returned home with her mother, and Raymond Boylan was ordered to have no contact with his daughter. BCCSB subsequently filed a case plan with the following objectives: Marcia was to acknowledge that Raymond was sexually abusing Amanda, Marcia was to protect Amanda, both parents were to be psychologically evaluated, and Raymond was to seek offender treatment.
On August 15, 1997, Amanda was adjudicated abused and dependent with "no finding of perpetrator of abuse by agreement of the parties." The trial court ordered Raymond Boylan to seek sex offender treatment.
On November 1, 1995, BCCSB filed a complaint in the Butler County Court of Common Pleas, Juvenile Division, alleging that Amanda was a neglected, abused, and dependent child. The complaint reiterated the previously made allegations of sexual abuse by Raymond Boylan and also alleged that Raymond had violated the "no contact" order of the court by visiting Amanda and her mother in their home.
The juvenile court held an emergency ex parte hearing and granted temporary custody to BCCSB. On December 15, 1995, Amanda began residing with John and Adrienne ("Lynn") Hiler, her maternal aunt and uncle. On January 23, 1996, the Hilers were awarded temporary custody of Amanda.
On August 30, 1996, BCCSB filed a motion for permanent custody. On September 18, 1996, R.C. 2151.413(A)(1) was amended. Former R.C. 2151.413(A)(1) as construed by the Ohio Supreme Court requires the agency to have temporary custody of a child "for at least six months immediately preceding the filing of the motion for permanent custody." In re: Hayes (1997), 79 Ohio St.3d 46,47. Despite the fact that BCCSB did not have custody of Amanda and thus did not satisfy the jurisdictional requirement of the statute, a hearing on that motion was initiated on February 6, 1997. On the second day of the hearing, February 7, 1997, apparently realizing its error, BCCSB moved for and was awarded temporary custody of Amanda. With no objection by appellants' counsel, the trial court permitted BCCSB to withdraw its August 30, 1996 motion and file a new motion for permanent custody. BCCSB's second motion was filed on February 12, 1997, and thus under the current version of R.C. 2151.413(A)(1) which has no six-month requirement. In accordance with R.C. 2151.414(A)(1) and R.C. 2151.35, the trial court held a final hearing on the permanent custody motion on March 21, 1997, at which it adopted the testimony taken on February 6 and 7. On March 27, 1997, the trial court awarded permanent custody of Amanda to BCCSB, and terminated appellants' parental rights.
Appellants present the following assignments of error on appeal:
Assignment of Error No. 1:
 The Trial Court Lacked Proper Jurisdiction To Grant Children's Services' Motion For Permanent Custody.
Assignment of Error No. 2:
 The Trial Court Erred In Admitting Hearsay Contained In Dr. Lee's Report.
Assignment of Error No. 3:
 The Trial Court Committed Plain Error In Allowing John Hiler To Give Hearsay Testimony Regarding Statements Made By Amanda Concerning Alleged Sexual Abuse Committed By Raymond Boylan.
Assignment of Error No. 4:
 The Trial Court's Decision To Divest Appellants Of Their Parent Rights Was Not Supported By Sufficient Evidence.
In the first assignment of error, appellants argue that the trial court lacked jurisdiction to grant BCCSB's motion for permanent custody. At oral argument, however, appellants' counsel withdrew the first assignment of error from consideration by this court. Accordingly, we will not address the issues raised therein.
In the second assignment of error, appellants argue that the trial court erred by admitting into evidence portions of a diagnostic evaluation of Raymond Boylan. The first two pages of the report, which was prepared by psychologist Charles E. Lee of the Children's Diagnostic Center, Inc. ("CDC"), contain allegations purportedly made by Raymond Boylan's children, ex-wife, and other relatives that they had been victims of his physical and sexual abuse.
We do not agree with appellant that the complained of statements in the report are hearsay. "Hearsay" is defined in Evid.R. 801(C) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In this case, BCCSB offered Dr. Lee's entire report into evidence, but stated that the allegations contained in the first two pages were offered not for their truth, but as "part of the basis for Dr. Lee's conclusions." BCCSB explained further that, "* * * this is part of what he uses to make his assessment * * * it should be permitted into evidence for purposes of what is in this examiners state of mind when he talks to these people * * * and draws his conclusions regarding these people." The trial court judge admitted the evidence with the caveat that "[w]e're not accepting it for the truth of the matter." Accordingly, we find that Dr. Lee's entire report was properly admitted.
Moreover, even if this evidence were deemed to be hearsay, we would not reverse the trial court on this issue. We acknowledge that "[h]earsay is not admissible in adversarial juvenile court proceedings at which a parent, charged with neglecting his or her children, may lose custody of the children." In re: Vickers Children (1983), 14 Ohio App.3d 201, paragraph three of the syllabus. However, a trial court has broad discretion in the admission or exclusion of evidence, and its judgment will not be reversed absent a clear showing of abuse of discretion resulting in material prejudice. State v. Hymore (1967), 9 Ohio St.2d 122,128, certiorari denied (1968), 390 U.S. 1024, 88 S.Ct. 1409. A reviewing court will be slow to overturn an adjudication because inadmissible evidence was admitted unless the trial court actually relied on that evidence in its judgment. In re: Sims (1983), 13 Ohio App.3d 37, 41. A trial judge is presumed to be capable of disregarding improper testimony. Id. In this case, it does not appear that the trial court relied on these allegations against Boylan in reaching its decision. Thus, even if the complained of statements were improperly admitted, appellants were not prejudiced and any error was harmless beyond a reasonable doubt. See id; State v. Hartford (1984), 21 Ohio App.3d 29. Appellants' second assignment of error is overruled.
In their third assignment of error, appellants argue that the trial court improperly admitted hearsay testimony by Amanda's uncle and custodian, John Hiler, concerning her allegations of sexual abuse by Raymond Boylan. Appellants do not indicate which portions of Hiler's testimony they find offensive; however, we have reviewed his testimony and find that the only statements concerning Amanda's complaints of sexual abuse were solicited by appellants' counsel. Under the doctrine of "invited error," it is well-settled that a party cannot take advantage of an error that he himself invited or induced. Lester v. Lueck (1943), 142 Ohio St. 91,92; State v. Ferguson (Mar. 4, 1991), Butler County App. No. CA90-02-036, unreported at 9. Specifically, a party may not procure a reversal of a judgment due to an error for which he is actively responsible. Lester at 93. Appellants' third assignment of error is overruled.
In their fourth assignment of error, appellants complain that the trial court's decision granting BCCSB's request for permanent custody is not supported by clear and convincing evidence. In particular, appellants contend that there was insufficient evidence to support a determination that Raymond Boylan sexually abused Amanda and that Marcia Boylan failed to protect Amanda from that abuse.
Under R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to an agency if the court determines by clear and convincing evidence that permanent custody is in the child's best interest and the child cannot be placed with either of its parents within a reasonable time. Clear and convincing evidence is that degree of proof which creates in the mind of the trier of fact a firm belief as to the facts sought to be established. In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368; In the Matter of Wesley Galyon (Sept. 29, 1997), Butler App. No. CA97-01-008, unreported. An appellate court will not reverse a trial court on appeal if its judgment is supported by sufficient credible evidence. Holcomb.
The trial court shall find that a child cannot be placed with either parent within a reasonable time if the court determines by clear and convincing evidence that one or more of the factors set forth in R.C. 2151.414(E) exist. At issue in the present case are R.C. 2151.414(E)(1) and (12) which state:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * *
(12) Any other factor the court considers relevant.
From September 1995 until May 1996, Raymond and Marcia Boylan participated individually and together in a total of three kinds of counseling at Catholic Social Services ("CSS"). From November 1995 until May 1996, Marcia attended the Adult Abuse Awareness group for non-offending parents of sexually abused children. Marcia and Raymond participated together in couples therapy from February to May 1996. Raymond was part of an offenders' group from September 1995 until December 1995. In May 1996, at their request, the court permitted the Boylans to withdraw from CSS and to seek counseling with Dr. Janet C. Brinn.
At the hearing on permanent custody held on February 6 and 7, 1997, Ellen Briggs, a clinical social worker at CSS, testified that she worked with Marcia Boylan in the group for non-offending parents and with Marcia and Raymond Boylan in couples therapy. Briggs testified that in therapy both Marcia and Raymond persistently maintained that Raymond had been falsely accused and that he had not sexually abused Amanda. Raymond Boylan admitted to Briggs that he had sexually abused the children from his first marriage more than twenty years previously, and it was Briggs' opinion that Raymond had not changed his behavior. Briggs based this conclusion on Raymond's failure to seek relapse prevention counseling and on her observation that Raymond exhibited a number of behaviors characteristic of sex offenders, including: minimizing problems, exhibiting a need to be in control of the family counseling sessions, discrediting the counselor's authority, threatening suicide, criticizing others to enhance his own ego, and accusing others of misunderstanding him.
Jim Sarris, a licensed social worker CSS, directed the sex offender's orientation group that Raymond Boylan attended in the fall of 1995. Sarris also provided marital therapy to Marcia and Raymond Boylan from February 1 through April 25, 1996. In the orientation group, Raymond admitted that he had sexually abused the children from his first marriage, and that he had not received any treatment for those offenses. Raymond indicated, however, that he viewed this as part of his past and sexual abuse was no longer a problem. Sarris testified that Raymond exhibited a number of indicators that he was at high risk to re-offend, including: a history of being physically and sexually abused by his own father, a history of drug and alcohol abuse, avoiding accountability, and avoiding positive relationships in the treatment group. In a report to BCCSB that was admitted into evidence, Sarris wrote that both Boylans denied any sexual abuse of Amanda and that Raymond accused Amanda of lying. Raymond expressed that the sessions were not helpful, that he wanted to quit the sessions and that Sarris had "ruined [the Boylan's] family." In a different report, Sarris noted that Raymond and Marcia struggled through six miscarriages before Amanda, and that their "special child" was born at serious risk to Marcia's health. Sarris stated that often pedophiles justify sexual behavior with children as part of their "special relationship." Sarris wrote that the treatment "appears to have minimal impact on Mr. Boylan's need to successfully identify and utilize a relapse prevention model to reduce the risk of further sexually abusive behaviors."
In couples therapy with Sarris, Marcia Boylan denied that Amanda had ever been sexually abused and "adamantly supported her husband." Sarris expressed concern about Amanda being in Marcia's care where Marcia did not believe Amanda, stating: "If she was abused and mother doesn't believe her she doesn't feel safe. If she doesn't feel safe she's not gonna feel secure, she's not gonna feel healthy, she's not gonna feel strong. She's not going to feel good about herself or the world, not gonna feel trusting." In his report to BCCSB, Sarris opined that Marcia was not a suitable par ent if she was unwilling to believe Amanda's allegations of sexual abuse by Raymond. Sarris concluded that the treatment had been "ineffective" in helping Marcia to protect Amanda from sexual abuse and to "recover from the impact of sexual abuse on the family."
Dr. Charles E. Lee, a psychologist at CDC, performed an early evaluation of both Boylans in separate interviews in June 1995. In a report that was admitted into evidence, Dr. Lee noted that the Boylans had been referred to him due to accusations that Raymond had sexually abused Amanda. Amanda told a baby-sitter that her father "bit my monkey (referring to her vagina) and made me bleed." At the time of his evaluation, Lee was aware that BCCSB reported receiving several calls concerning Raymond's past sexual and physical abuse of his ex-wife, his two children from his previous marriage, and his former brother-in-law. Lee stated that Marcia was adamant that Raymond had not sexually abused Amanda. Lee opined that Marcia had a level of denial that would make it difficult for her to face matters that were unpleasant and that this was consistent with her denial of Amanda's sexual abuse. As to Raymond, Lee observed that his profile indicated someone who operates with "considerable denial, repression and passivity." Lee could not find that Raymond definitively sexually abused Amanda, but highlighted several risk factors including, Raymond's ongoing use of alcohol and Marcia's refusal to believe Amanda's allegations. Lee concluded that "[i]f this family is to be reunited * * * the first order of business would be to control [Raymond's] drinking * * * [then] reunification can be considered."
Dennis Hart, a substance abuse counselor at Behavioral Counseling Services of Butler County, evaluated Raymond for alcohol dependence and concluded that he was at risk and recommended that he seek treatment for substance abuse.
Tamera Langen, a clinical social worker at CSS, testified that she worked with Amanda in therapy for twenty-four sessions between October 1995 until June 1996. Langen stated that during the time she worked with Amanda, the girl had behavioral problems that were consistent with sexual abuse such as tantrums, bed-wetting, and nightmares. After several sessions, Amanda made statements indicating that she had been sexually abused. Amanda also expressed anger that her mother did not believe her. Langen noted that Amanda would break out in hives and refuse to eat on the days she visited with her mother. In a report that was admitted into evidence, Langen wrote: "Amanda * * * said she was mad at her dad for "scratching [her] on [her] tummy", and for "touching [her] private parts." Langen also observed that: "Amanda came into the session very angry, saying she was mad because "my old mommy doesn't believe I told her my old Daddy hurt my privates." In another session, Langen noted that Amanda said that her father "kissed me on my privates (pointed to genitals) * * *."
Mary Vicario, a counselor at Butler Behavioral Health Services, Inc. saw Amanda on a weekly basis starting in July 1996 and continuing through the date of the permanent custody hearing. Vicario testified that Amanda consistently indicated that her "daddy Ray" hurt her "privates," that she was afraid that she would have to return to her "daddy Ray," and that her "mommy Marcia" doesn't believe her and won't stop her "daddy Ray" from hurting her. Vicario further testified that she believed Amanda had been sexually abused and that she had several characteristics of sexually abused children including her obsession with cleaning ("she can't get things clean enough"), and other behaviors. Vicario recounted that Amanda "told me that Ray has taken his nails and scratched her privates on the front and on her bottom until they were red. * * * She's described Ray as putting his mouth on her privates and biting and hurting her. * * * She's talked about telling Marcia and Marcia not believing her. * * * She's practicing calling 911 in case she has to go back to live with Marcia and Ray cause she said the police can come and help her be safe because Marcia can't help her be safe." In Vicario's opinion, Amanda should have no further contact with either parent so that she could avoid further trauma and be free of "disruptive anxiety and physical symptoms."
Lori Hartman, a social worker with BCCSB, supervised visits between Amanda and Raymond Boylan at the time when Amanda was living with her mother. Hartman recalled that during visitation Marcia would act inappropriately in front of Amanda by crying and stating that she didn't believe that Amanda had been sexually abused and that she didn't understand why Raymond couldn't be in her home. Hartman also testified that Amanda appeared to be at ease with Raymond and was not afraid of him. Finally, Hartman testified that comments by Amanda suggested that Raymond had had unsupervised visits with Marcia and Amanda in violation of the court order.
John Hiler, Amanda's custodian and maternal uncle, testified that when Amanda first came to live with them she exhibited several emotional problems. She had nightmares, threw temper tantrums, and did not speak clearly. Hiler observed that Amanda's problems had abated since she had been living with him and his wife, Lynn. Hiler recalled that when Amanda had weekly supervised visits with her mother, she would break out in hives the day before the visit. Hiler testified that once Amanda's visits with Marcia stopped, her behavioral problems became less frequent and she became more manageable. Hiler stated that on more than one occasion Amanda told him and his wife that "her daddy bit her monkey" and hurt her.
Three witnesses testified for the Boylans. Janet C. Brinn, a psychologist, counseled Raymond and Marcia Boylan from March 1996 until the date of the hearing. Brinn stated that the Boylans were distraught about losing their child, but were "determined to work through their situation." Brinn testified that some of Amanda's behavioral symptoms were consistent with her having been separated from her parents. Brinn also testified that although Raymond Boylan had previously abused children, he did not require treatment as a sex offender. Brinn acknowledged that she had talked with Raymond about seeking treatment for alcohol abuse, but that he had not done so to her knowledge.
Sherry Maffeo, Marcia's cousin, testified that she had known Raymond Boylan for twenty years and had lived with the Boylans for a couple months when her seven-year-old daughter was two years old. Maffeo stated that she trusted Raymond with her children and that Raymond and Amanda were just like a "normal father and daughter" and that they got along well. Maffeo stated further that the Boylans had a "loving relationship" and as far as she knew had not hit each other.
Raymond Boylan testified that he had abused his two sons from his first marriage, but denied sexually abusing his daughters. He also admitted that several years earlier he had been a heavy drinker and drug abuser. At the time of the hearing, he stated that he only drank two to three beers per night. Raymond denied sexually or physically abusing Amanda. He stated, however, that he thought Amanda may have been sexually abused in her first foster care placement. On cross-examination, Raymond stated that he was abused by "a minimum of fifteen other people" when he was growing up and that he never got treatment for it because he "never knew it was wrong."
To summarize, the testimony presented at the hearing demonstrates that Marcia and Raymond Boylan have failed to address the issues that caused Amanda to be placed outside home. Both parents are in denial concerning the sexual abuse that Amanda has repeatedly and consistently described. Despite access to the assistance of several agencies, Raymond has not addressed his problems with alcohol abuse even though it places him at high risk to commit sexual abuse. Raymond has also failed to come to terms with his inclination to commit sexual offenses against children. For her part, Marcia does not believe her daughter and has failed to acknowledge that Raymond could have abused Amanda. When she failed to abide by the "no contact" order placed on Raymond, Marcia exposed Amanda to possible further abuse. Based on the foregoing, the trial court's finding that Amanda could not or should not be returned to appellants within a reasonable period of time is supported by competent, credible evidence. The fourth assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and KOEHLER, J., concur.